# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> CATALINO PINEDA, ) <br> ) <br> Defendant. ) <br> _____ ) | No. CR 09-2542-TUC-FRZ (CRP) <br><br> REPORT AND RECOMMENDATION ON MOTION TO SUPPRESS STATEMENTS |

Pending before the Court is Defendant's motion to suppress evidence. (Doc 36). In this motion, Defendant contends that statements he made to Border Patrol agents near the border after an encounter with them should be suppressed. Defendant asserts that prior to questioning, the Border Patrol agents placed Defendant in custody, or the functional equivalent thereof, and subjected Defendant to custodial interrogation without giving Defendant Miranda warnings. (Doc 36, 54). The Government contests the motion and argues that the statements are admissible because the encounter with Defendant was a Terry stop, not a custodial interrogation, and therefore Miranda warnings were not required. (Doc 44). The Magistrate Judge heard evidence on the motion on June 10, 2010. (Docs. 56, 58). For the reasons discussed infra., it is the report and recommendation of the Magistrate Judge that the District Judge, after his independent review, GRANT the Motion to Suppress Statements.

## I. FACTUAL FINDINGS

At the evidentiary hearing, the Government produced the following witness to support its position:

- Luis G. Navarro, Border Patrol agent employed by the Border Patrol for the last 4.5 years, who was assigned to the Nogales horse patrol unit, Nogales Station, in Nogales, Arizona at the time of the incident. (Doc 58, Motion Hearing Transcript from 06/10/2010 ("TR"), p 14-15).

The following are the factual findings of the case from the evidentiary hearing. The facts are not contested by the parties.

On Saturday, October 24, 2009, at 1:00 a.m., United States Border Patrol Agent Luis Navarro received a call from the Mobile Surveillance System camera operators in Nogales, Arizona. (TR 16). The call was regarding a group of individuals heading north from the international boundary fence, on the east side of Kino Springs. (TR 17).

Agent Navarro, along with two other horseback Border Patrol agents, began to approach the area where the group was located. (TR 17). Upon arriving to the general area where the group was, the ground surveillance unit guided the agents to the group's precise location. (TR 18).

Agent Navarro and at least ten other agents discovered the group of twenty individuals. (TR 19). Agent Navarro testified that he and the other agents knew that these were the same individuals who had crossed the border. (TR 31). When the agents found the individuals, the group of twenty had separated into a few smaller subgroups. (TR 19).

Agent Navarro apprehended one of the smaller subgroups on a mountain, as it was easier for him to do so being that he was on horseback. (TR 19, 29). Defendant was part of this seven-person smaller mountain group. (TR 20). Agent Navarro does not recall whether or not he asked the group any questions while on top of the mountain. (TR 31). After apprehending the group, Agent Navarro walked the group down the mountain to a staging

area where the entire large group of twenty was reunited. (TR 20). The agents commanded the group to sit down in the staging area. (TR 32).

Between one hour and two hours after the encounter on the mountain, Agent Navarro began the formal questioning. (TR 20, 32). At the evidentiary hearing, Agent Navarro was asked about the one to two hour delay between the initial encounter to the time of questioning. He testified that a portion of this time consisted of bringing the subgroup off of the mountain into the staging area. (TR 37). There was also further delay as the agents waited to start the questioning until all of the other subgroups were brought together to the staging area. (TR 37).

Before questioning the individuals, the agents transported about seven of them including Defendant to the back of a caged Border Patrol truck. (TR 33). The individuals were locked in the caged truck with two armed Border Patrol agents on the outside. (TR 33, 36). Agent Navarro conducted the questioning from outside the caged vehicle. (TR 33-34, 36).

Before questioning the individuals in the truck, Agent Navarro did not read Defendant his Miranda rights. (TR 34). Agent Navarro testified that he interviewed each individual for approximately seven minutes. (TR 21, 34). Agent Navarro recorded each individual's answers onto an I-213 field form. (TR 35). Agent Navarro questioned Defendant about his citizenship. (TR 23, 35). Defendant answered that he is from Guatemala. (TR 23). Agent Navarro then asked Defendant if he had any documents that would allow him to be in the United States legally. (TR 23). Defendant answered in the negative. (TR 23). Agent Navarro asked Defendant his name, date of birth, place of birth, and his mother's and father's name. (TR 35). Agent Navarro also asked Defendant whether he entered into the United States through an entry port or some place other than an entry port. (TR 35). Agent Navarro did not ask Defendant about any prior criminal convictions or any prior deportations. (TR 23).

Agent Navarro testified that during the questioning, Defendant did not seem like he

was under the influence of drugs or alcohol. Agent Navarro did not raise his voice, draw his weapon, threaten or coerce Defendant, accuse Defendant of lying, or play any tricks on Defendant. (TR 21, 22). Agent Navarro testified that Defendant was very compliant. (TR 22, 31).

From the staging area, Defendant was transported to the Tucson Sector Coordination Center, where he was questioned further. The Government concedes that any statements made at the Tucson Sector Coordination Center will not be used in the Government's case-in-chief. (Doc 44, Government's Response to Defense Motion to Suppress, Page 5; TR 45-46).

The remaining issue in the motion is whether statements Defendant made to Border Patrol agents upon apprehension near the border are admissible. The Government contends the statements are admissible, as they were the result of routine field questioning by Border Patrol agents regarding citizenship and immigration status, and thus the questioning constituted a <u>Terry</u> stop. Defendant contends the statements must be suppressed because the statements resulted from custodial interrogation and Defendant was not <u>Mirandized</u> prior to questioning. Defendant asserts the questioning was not a <u>Terry</u> stop; rather, it was tantamount to a custodial interrogation, given the Border Patrol agents already had probable cause to arrest Defendant, waited between one to two hours before questioning him, and placed Defendant in a caged vehicle during questioning.

## II. ANALYSIS

When a Border Patrol agent has reasonable suspicion to suspect a person of entering the country illegally, he may briefly stop that person and inquire into his citizenship and immigration status. <u>United States v. Brignoni-Ponce</u>, 422 U.S. 873, 884-885 (1975). <u>Terry</u> stops permit law enforcement officers to "in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." <u>Terry v. Ohio</u>, 392 U.S. 1, 22 (1968). Such an investigative stop "must be temporary and last no longer than is necessary to

- 4 -

effectuate the purpose of the stop." Brignoni-Ponce, at 881-882. Law enforcement officers must also diligently pursue their investigation to confirm or dispel their suspicions quickly during an investigative stop. United States v. Sharpe, 470 U.S. 675, 686 (1985).

As a law enforcement officer's stop of an individual increases in length of time and intrusiveness into the individual's freedom, at some point the stop can no longer be characterized as a Terry stop. Sharpe, 470 U.S. 675, 685. Miranda is implicated if the facts show that law enforcement is holding a person in custody and interrogating that person. Miranda v. Arizona, 384 U.S. 436, 467 (1966). "Whether a person is 'in custody' for purposes of Miranda is a mixed question of law and fact...". United States v. Gallindo-Gallegos, 255 F.3d 1154, 1154 (9th Cir. 2001) (amending United States v. Gallindo-Gallegos, 244 F.3d 728 (9th Cir. 2001). The Ninth Circuit considers the totality of the circumstances to determine whether a person is in custody for purposes of Miranda. United States v. Medina-Villa, 567 F.3d 507, 519, (9th Cir. 2009), *quoting* United States v. Booth, 669 F.2d 1231, 1235 (9th Cir. 1981). In its analysis, the Court considers "the language used by the officer to summon the individual, the extent to which he or she is confronted with the evidence of guilt, the physical surroundings of the interrogation, the duration of the detention, and the degree of pressure applied to detain the individual." *Id*.

Critical to this Court is the unjustified one to two hour delay before Border Patrol agents asked any questions to confirm their suspicions that Defendant and the other individuals entered the country illegally. Terry permits a brief stop during which law enforcement officers work diligently to either confirm or dispel their suspicions of criminal activity. In this case, the one to two hour delay before questioning was not a brief stop. Agent Navarro's actions were far from diligent, but rather reflected his own foregone conclusion that Defendant was to be taken into custody. After the agents discovered the group of twenty individuals, it is understandable that some amount of time was necessary for the eleven agents to gather those individuals and ensure officer safety. But, one to two hours for eleven officers to gather twenty individuals when there is no evidence that the individuals

resisted the Border Patrol agents is a significant amount of time. Then, after gathering the individuals, the agents put at least seven of those individuals into a caged Border Patrol truck prior to questioning them. Once the individuals were in the truck, Agent Navarro took the time to ask each of the individuals a number of questions while completing an I-213 form; spending approximately seven minutes with each individual. This was not a brief investigative stop permitted by Terry. While it may be an organized approach to processing twenty individuals on immigration charges, it was not a diligent police investigation intended to confirm or dispel suspicions of criminal behavior.

The fact that Defendant was questioned in a caged truck is also awkward for the Government. The use of physical restraint does not automatically convert a Terry stop into a custodial arrest. Generally, however, unnecessary physical restraint will be deemed unreasonable and therefore become a custodial arrest absent special circumstances. Washington v. Lambert, 98 F.3d 1181, 1189 (9th Cir. 1996). The Ninth Circuit has "only allowed the use of especially intrusive means of effecting a stop in special circumstances, such as 1) where the suspect is uncooperative or takes action at the scene that raises a reasonable possibility of danger or flight; 2) where the police have information that the suspect is currently armed; 3) where the stop closely follows a violent crime; and 4) where the police have information that a crime that may involve violence is about to occur." *Id*. (internal citations omitted). While restraint of a suspect is not dispositive of whether a custodial setting exists, it is relevant to the determination.

In the present case, officers placed Defendant, along with six other suspects, in a caged Border Patrol truck before questioning each of them for approximately seven minutes and completing the I-213 field form. Although the agents did not handcuff the individuals or draw their weapons, the amount of physical restraint used was significant and unnecessary to the task of asking a couple of questions regarding immigration status to confirm suspicion of illegal entry.

The Government cites United States v. Galindo-Gallegos, in which the Ninth Circuit

found Border Patrol agents diligently pursued a brief investigation in the stop of individuals suspected of illegal entry. 244 F.3d 728 (9th Cir. 2001) (amended by United States v. Galindo-Gallegos, 255 F.3d 1154 (9th Cir. 2001). In Galindo-Gallegos, two Border Patrol agents saw a large group of individuals running near the United States-Mexico border. *Id*. at 729. The agents had reasonable suspicion that these individuals were illegal aliens, based on the fact that they were running near the border. *Id*. One agent apprehended part of the group and ordered them to sit down, while the other agent pursued the fleeing individuals, including Defendant Galindo-Gallegos. *Id*. After the group was amalgamated and sat down in a circle, the two agents asked each of the individuals their country of origin and whether they had proper legal status to be in the United States. *Id*. Once the defendant admitted that he had illegally entered the country, he and the others were placed in Border Patrol vehicles. *Id*.

The Galindo-Gallegos court held that the initial questioning was a Terry stop, not custodial interrogation, because it was brief, used to confirm reasonable suspicion of illegal activity, and was done in public, to the extent that there were fifteen to twenty suspects compared to only two Border Patrol agents, so the suspects would not fear improper police conduct. *Id*. at 732.

The case before this court differs significantly from Galindo-Gallegos. In Galindo-Gallegos, Border Patrol agents had reasonable suspicion that the individuals questioned crossed the border illegally. They asked a few questions to confirm their suspicions and then after confirmation, the agents placed the suspects in a law enforcement vehicle and arrested them.

In the current case, Agent Navarro testified that when the agents first made contact with the group of twenty individuals, he knew these were the individuals who illegally crossed the border. In asking questions, Agent Navarro was not conducting a brief investigatory stop to confirm any reasonable suspicion of illegal entry as he already believed he had probable cause to arrest them. Further, while in Galindo-Gallegos, two Border Patrol

1  agents controlled fifteen to twenty individuals by requiring them to sit in a circle, here, the
2  agents numbered at least eleven to the twenty suspects and at least some of these suspects
3  were locked in Border Patrol vehicles. Finally, rather than ask a couple of questions to
4  confirm suspicion of illegal entry, Agent Navarro questioned each individual, including
5  Defendant, for approximately seven minutes and completed the I-213 form during
6  questioning. This conduct exceeds the permissible bounds of a brief, investigatory <u>Terry</u>-
7  stop.

### III. CONCLUSION

A <u>Terry</u> stop implicates the Fourth Amendment, which is why the brief nature of the intrusion, and the officer's diligence to assure that brevity, is so critical to justifying this exception to the Fourth Amendment. In this case, upon discovery of the twenty individuals Agent Navarro had reasonable suspicion that Defendant was involved in the criminal activity of entering this country illegally. But, Agent Navarro did not diligently pursue an investigation to confirm or dispel that suspicion. The delay in Agent Navarro asking Defendant questions was well over an hour, likely closer to two hours. Agent Navarro is fluent in Spanish, so questioning could have been initiated immediately after Defendant was detained. At the outside, the few questions needed to confirm any lingering suspicions should have taken place as soon as the group arrived at the staging area. It is likely Agent Navarro did not need to ask any questions to confirm any suspicions as he testified that when he first found the group of individuals he knew they were the ones that illegally crossed the border.

Thus, rather than question Defendant immediately or in the staging area, the questioning took place near the time of transport. The location of questioning in a locked cage of a Border Patrol vehicle is also significant. The timing and location of the questioning was not determined with a concern for diligent criminal investigation during a brief stop but rather this timing was purely a matter of convenience for Agent Navarro. This unjustified delay in questioning for one to two hours after Defendant was detained falls far outside the

ambit of Terry.

Terry is a narrow exception to the Fourth Amendment that allows for brief, investigatory questions to confirm reasonable suspicion of criminal activity. In the present case, the ultimate questioning of Defendant was not done to confirm suspicion of illegal activity. Agent Navarro had concluded unequivocally at the time of apprehension that Defendant had committed a crime. Agent Navarro testified that it took seven minutes to question Defendant. That is, it took seven minutes to get the information to fill out the I-213 field form. However, it takes less than one minute to ask the requisite questions to confirm suspicions of criminal activity such as illegal entry, a fact this Court well knows from the regular opportunity to take an individual factual basis for illegal entry from seventy defendants in one hearing.

Terry is an exception to the Fourth Amendment's proscription against unlawful seizures of a person by the Government. That exception relies on officer diligence, not officer convenience. That circumstances dictated that it was a foregone conclusion that Defendant was here illegally does not excuse a lack of diligence, but rather, is a separate basis for requiring Miranda rights to be explained. If the Government wants to rely on Terry to justify not providing Miranda warnings before questioning suspects, its officers must act diligently. In this case, Agent Navarro did not.

Border Patrol agents need to be able to ask individuals whom are reasonably suspected of being in this country illegally about those individuals' citizenship and immigration status. If suspects are detained briefly for a few investigatory questions to confirm illegal activity, that is a valid Terry stop. However, agents may not place individuals under custodial arrest, or the functional equivalent of, absent probable cause to arrest. If the agents have probable cause to arrest and need to fill out an I-213 field form, that is acceptable, but the agents must read the suspects their Miranda rights. The Fifth Amendment right to be free from self-incrimination does not cease to exist at the border.

**IV. RECOMMENDATION**

For the reasons discussed <u>infra</u>., this Court recommends that the District Judge, after his independent review, find that the stop and questioning conducted by the Border Patrol agent was not a brief, investigatory stop used to confirm suspicions of criminal activity, as allowed by <u>Terry v. Ohio</u>. 392 U.S. 1 (1968). Rather, the interrogation was done while Defendant was in custody, for administrative convenience to complete the I-213 field form and to aid the agents in organizing the transport of the suspects to the Tucson Sector Coordination Center. Administrative convenience is not an exception to <u>Terry</u>. Therefore, <u>Miranda</u> warnings were required prior to the questioning, and Defendant's statements must be suppressed.

For the reasons outlined above, the Magistrate Judge recommends that the District Court, after its independent review and analysis, GRANT Defendant's Motion to Suppress. (Doc 36).

Pursuant to Federal Rules of Criminal Procedure 59(b)(2), any party may serve and file written objections within fourteen days of being served with a copy of the Report and Recommendation. If objections are not timely filed, they may be deemed waived. The parties are advised that any objections filed are to be identified with the following case number: CR 09-2542-TUC-FRZ.

DATED this 19th day of July, 2010.

_____
CHARLES R. PYLE
UNITED STATES MAGISTRATE JUDGE